UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ERNEST JEFFRIES,

                  Petitioner,        **No. 10-CV-0549(MAT)**

   -vs-                           **DECISION AND ORDER**

JAMES CONWAY, Superintendent,

                  Respondent.

---

## I.    Introduction

Pro se petitioner Ernest Jeffries ("Jeffries" or "Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. §2254 alleging that he is being unconstitutionally detained in Respondent's custody. Jeffries is incarcerated pursuant to a judgment entered against him in New York State Supreme Court, Monroe County, on April 14, 2005, following a jury verdict convicting him of one count of depraved indifference murder.

## II.  Factual Background and Procedural History

On August 29, 2004, six-week-old Lamarah Jeffries ("Lamarah") died as the result of being thrown onto a wooden floor by her father, the petitioner in this matter. The indictment charged Petitioner with one count of New York Penal Law § 125.25(4) and alleged that under circumstances evincing a depraved indifference to human life, Petitioner recklessly engaged in conduct which created a grave risk of serious physical injury or death to another person less than eleven years old, by forcibly throwing the Lamarah

-1-

to the ground and causing her head to strike the floor, and thereby causing her death.

At trial, Ubelinda Jiminez ("Jiminez"), Lamarah's mother, testified that she had brought her daughter to visit her mother, Maria Gonzalez ("Gonzalez") at Gonzalez's house on Norton Street in Rochester. T.732.[1] Lamarah had a fever, but was otherwise a healthy six-week-old infant. T.732-33. There is no indication that prior to the day of her death, she had been abused or neglected in any way by Petitioner.

While at her mother's house, Jiminez received a phone call from Petitioner asking her to come pick him up at the apartment they shared on Seneca Parkway. T.734. After picking up Petitioner, Jiminez returned to Gonzalez's house. Id.

Almost immediately upon their return, Petitioner and Jiminez began to argue heatedly: Petitioner wanted to take Lamarah to visit at his mother's house, but Jiminez refused, citing the fact that Lamarah had a fever and it was raining outside. T.735-39, 742. The argument between Petitioner and Ubelinda, which began inside of the home, escalated onto the porch and became so loud that it drew the attention of the neighbors living across the street.

At one point, Petitioner snatched the baby out of the carseat and held her in one hand near the level of his head while Jiminez and her mother attempted to grab the baby away from Jeffries.

---

[1]

Citations to "T.__" refer to pages in the transcript of Petitioner's trial.

T.742. Begging Petitioner to give them Lamarah, Jiminez and Gonzalez continued to try to get the baby out of Petitioner's hand. Petitioner refused, holding the baby out of their reach. T.742-43. Gonzalez recalled that Jeffries was swinging his free arm out towards her and Jiminez, keeping them away. T.743.

As the two women approached, Petitioner punched Jiminez and said, "If you don't get away from me, I am going to throw the baby." T.593, 818-19, 848. A neighbor, Samantha Wilson ("Wilson"), also heard Petitioner make this statement.

Gonzalez related that Petitioner "got madder and madder" and eventually punched Jiminez in the mouth and split her lip. As he did that he "swing [sic] the baby to [the] other side" and "just throw [sic] [her] to the other side." T.744. Gonzalez described Jeffries as having thrown Lamarah as if she were a ball. Jiminez said that Jeffries "threw her on the floor . . . he had his hand like this and shot her down."

When he threw Lamarah, Petitioner was holding her about the level of his head. Lamarah struck the floor with such force that Jiminez and Gonzalez heard her skull crack. T.745. The baby immediately stopped breathing and her skin began to turn blue. Id. Gonzalez was trying to hold onto Jeffries to keep him from leaving, but he stormed off, punching her in the forehead and kicking her leg. T.743.

As he stepped over his daughter's motionless body, Petitioner said, as he left, "Fuck the baby." T.827. Petitioner then got into Jiminez's minivan and drove off. T.746, 747-48, 827.

Jiminez bent down to check on Lamarah and began to administer CPR. While Gonzalez called 911, Jiminez carried Lamarah across the street where two neighbors, Maldonado and his girlfriend, Caceres, were getting a car to take the baby to the emergency room.

Jiminez continued to perform CPR on Lamarah during the drive to Rochester General Hospital. Upon palpating the right rear of Lamarah's head, Dr. Jeffery Everett ("Dr. Everett"), the attending pediatrician, could detect multiple skull fractures. In fact, there were sections of skull floating freely in fluid, like a "crushed egg which was being contained by the scalp itself." T.666. Lamarah's fontanel, which should have been soft and even, was bulging and firm. T.669. By this point, Dr. Everett detected signs of severe brain or brain stem damage and believed that Lamarah was suffering from an intracranial injury (i.e., an injury within the skull), as the result of blunt trauma to her head.

Because of the severity of her injuries, Lamarah was brought to Strong Memorial Hospital, a facility with more life-saving technology. Dr. Ellie Crow ("Dr. Crow"), the on-call doctor, observed that Lamarah had a great deal of swelling at the back of her head, which felt "boggy." There were "a lot of palpable fractures in her head, like a broken eggshell." T.800. Lamarah, who appeared to Dr. Crow as lifeless and limp, began to deteriorate

further. The doctors were not able to insert a central line into Lamarah in order to administer critically necessary I.V. fluids. Lamarah went into cardiac arrest. Chest compressions momentarily restored Lamarah's heart rate but it was lost again. At this point, two hours and twenty minutes had elapsed since she had arrived at the second hospital, having lost all of her blood volume due to her catastrophic head injury. She was pronounced dead and disconnected from the ventilator.

The autopsy findings indicated that Lamarah had sustained a significant blunt trauma to her skull, which was not consistent with a fall. T.882-83, 930. According to the pathologist, the infant's severe injuries were typical of what one would expect to see in a high-speed motor vehicle collision, not a fall to the floor. T.921, 930. The pathologist opined that Lamarah died from blunt trauma to the skull, and that there had been a single impact. T.919. The injuries, which appeared to have been inflicted within several hours of death, were consistent with the infant having been thrown onto a wooden floor. T.882-83, 930.

Later that night, Petitioner turned himself in to the police and voluntarily spoke with detectives about the incident. According to Investigator Gleason, who took Petitioner's statement, Petitioner was crying, upset, and afraid that the officers were going to beat him up. Petitioner agreed to waive his rights and give a statement. His story was not inconsistent with Jiminez's and Gonzalez's inasmuch as he agreed they all had argued about whether

-5-

he would be permitted to take Lamarah to visit his mother. Petitioner, however, claimed that he had "fight off" Jiminez and Gonzalez, who were trying to get the baby away from him. Eventually, according to Petitioner, he decided to give up:

> That's when I thought [Jiminez] had [Lamarah] by her arm and I said Fuck it[,] take the baby[,] and I forcefully extended my left arm out and the baby went to the porch floor. I looked and I paused at my baby and said oh my God and then I fuckin [sic] left.

Petitioner also said that during the argument, Jiminez had pinched Lamarah on her arm, causing Lamarah to cry.

Several neighbors witnessed Petitioner's actions and testified for the prosecution. Enieda Nieves ("Nieves") recalled that Petitioner "put the baby up and threw it on the floor, slammed it." T.451. Carmen Caceres ("Caceres") described Petitioner's actions as "raising [his] right hand, [his] elbow is cocked but [his] elbow is slightly over [his] head," and said that Petitioner threw the baby "up and forward and down." T.495, 503. Jamil Maldonado ("Maldonado") heard the infant "slam on the floor" and said, with regard to Petitioner, "you know, he just throw [sic] it [sic] on the floor." T.548, 551, 571.

The judge returned a verdict convicting Jeffries as charged in the indictment of depraved indifference murder. He received the maximum sentence of 25 years to life.

Jeffries' conviction was affirmed on direct appeal. People v. Jeffries, 56 A.D.3d 1166 (App. Div. 4th Dept. 2008), lv. denied, 12 N.Y.3d 759 (N.Y. 2009). This timely habeas petition followed.

-6-

Petitioner's arguments in favor of habeas relief relate solely to the alleged legal insufficiency of the evidence to support the jury's finding of extreme reckless and depraved indifference for purposes of N.Y. Penal Law § 125.25(4). Petitioner argues that all of the evidence adduced at trial supported only a theory of intentional conduct. Therefore, he argues, by affirming his conviction for depraved indifference murder, the state courts unreasonably applied federal law as explicated in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), which requires proof beyond a reasonable doubt of every element of a crime to support a conviction.

For the reasons that follow, the petition is dismissed.

## III. Analysis of the Petition

### A.   The Legal Insufficiency Claims

Petitioner, claims as he did on direct appeal, that his conviction violates due process because certain required elements of depraved indifference murder were not proven beyond a reasonable doubt. Specifically, he argues that (1) the evidence was only sufficient to support an intent to kill, not recklessness; and (2) the evidence was legally insufficient to support a determination that he acted under circumstances evincing a depraved indifference to human life. The Fourth Department adjudicated his claims on the merits, and thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies.

-7-

Under AEDPA, the Court may award habeas relief only if the state court's adjudication of the merits of his federal claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or amounted to an "unreasonable determination of the facts" in light of the evidence presented in state court. 28 U.S.C. § 2254(d)(1)(2). The clearly established Supreme Court precedent for purposes of evaluating Jeffries' legal-insufficiency claim is Jackson, 443 U.S. 307, supra. Cavazos v. Smith, 132 S. Ct. 2, 3 (2011) (per curiam).

A habeas petitioner is entitled to habeas corpus relief based upon a claim that his conviction violates due process if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. at 324.  When reviewing the sufficiency of a state conviction, "[t]his 'standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.'" Langston v. Smith, 630 F.3d 310, 314 (2d Cir. 2011) (quoting Jackson, 443 U.S. at 324 n. 16).

### 1.   The State Law Relevant to Jeffries' Constitutional Sufficiency of the Evidence Challenge

The relevant state law is that in effect at the time the petitioner's conviction becomes final because the Constitution does not compel retroactive application of state law. See Great N. Ry.

Co. V. Sunburst Oil & Ref. Co., 287 U.S. 358, 364 (1932); Fiore v. White, 149 F.3d 221, 224-25 (3d Cir. 1998) (Alito, J.),(rejecting habeas claim based on state law precedent not in force "at the time of [petitioner's] conviction"), overruled on other grounds, 531 U.S. 225 (2001).

For habeas purposes, a New York state-court conviction becomes final 90 days after the New York Court of Appeals denies leave to appeal, which is when the defendant's time to apply for a writ of certiorari to the United State Supreme Court expires. Fernandez v. Artuz, 402 F.3d 111, 112 (2d Cir. 2005). Jeffries' judgment of conviction was entered on April 14, 2005, and his conviction was affirmed by the Fourth Department on November 14, 2008. The New York Court of Appeals denied leave on February 13, 2009. Jeffries' conviction thus became final 90 days after the New York Court of Appeals denied leave to appeal, on May 14, 2009. The law to be applied, therefore, is the formulation of depraved indifference murder articulated in People v. Feingold, 7 N.Y.3d 288, 292 (N.Y. 2006), which holds that "[a] defendant may be convicted of depraved indifference murder when but a single person is endangered in only a few rare circumstances[,]" People v. Suarez, 6 N.Y.3d 202, 212 (N.Y. 2005); and that "'depraved indifference to human life' is a culpable mental state[,]" People v. Feingold, 7 N.Y.3d at 296, overruling People v. Register, 60 N.Y.2d 270, 276 (N.Y. 1983); see also Policano v. Herbert, 7 N.Y.3d 588, 600 (N.Y. 2006).

### 2.   Analysis of the State Courts' Holdings

"Sufficiency claims are generally evaluated under § 2254(d)(1)" and the court must "look to 'whether the state court decision constitutes an unreasonable application of clearly established Supreme Court case law.'" O'Laughlin v. O'Brien, 568 F.3d 287, 298 (1st Cir. 2009) (quoting Hurtado v. Tucker, 245 F.3d 7, 15 (1st Cir. 2001)); accord Cavazos, 132 S. Ct. at 3-4. Here, the essential facts were not in dispute, and the Court concludes that 28 U.S.C. § 2254(d)(2) is not implicated. Rather, the parties disagreed on the legal meaning to be ascribed to those facts–that is, whether Jeffries' actions evinced an intent to seriously injure or kill, or, instead, showed extreme recklessness and depraved indifference to human life. Thus, an analysis under 28 U.S. § 2254(d)(1) is appropriate in the present case. O'Laughlin, 568 F.3d at 298 n.14.

The clearly established Supreme Court precedent applicable here "requires a reviewing court to review the evidence 'in the light most favorable to the prosecution.'" McDaniel v. Brown, 130 S. Ct. 665, 673 (2010) (quoting Jackson, 443 U.S. at 319). "[T]his means a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Id. (quoting Jackson, 443 U.S. at 326; citation omitted). This Court therefore must decide whether the

Fourth Department's application of <u>Jackson</u> to Jeffries' case was "objectively unreasonable." <u>Cavazos</u>, 132 S. Ct. at 4 (citing <u>Renico v. Lett</u>, 559 U.S. ___, ___, 130 S. Ct. 1855, 1862 (2010)).

As a general rule, federal courts "should be particularly cautious about issuing habeas, on grounds of the objective unreasonableness of a state court's conclusion that the evidence is sufficient, where there has been a verdict of guilt by a jury of a defendant's peers, . . . , where that verdict has been affirmed on appeal in the state system, and where there is no claim of constitutional error in the conduct of the trial." <u>Hurtado v. Tucker</u>, 245 F.3d 7, 19-20 (1ˢᵗ Cir. 2001); <u>see also</u> <u>Cavazos</u>, 132 S. Ct. at 4 ("Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold. The Court of Appeals in this case substituted its judgment for that of a California jury on the question whether the prosecution's or the defense's expert witnesses more persuasively explained the cause of a death. For this reason, <u>certiorari</u> is granted and the judgment of the Court of Appeals is reversed."). Indeed, even on direct appeal, claims under <u>Jackson v. Virginia</u> "are 'often made, but rarely successful.'" <u>Id.</u> (quoting <u>United States v. Moran</u>, 984 F.2d 1299, 1300 (1ˢᵗ Cir. 1993)). As discussed further below, the Court cannot conclude that the Fourth Department's decision was "objectively unreasonable" for purposes of granting habeas relief under 28 U.S.C. § 2254(d)(1).

-11-

### a. The Fourth Department's Ruling Regarding Petitioner's Intent

Petitioner argued on appeal that the evidence was only sufficient to support an intent to kill, not recklessness. For instance, appellate counsel pointed to medical testimony that the baby's injuries were not consistent with a simple fall, and that there had to have been some "increased accelerative force" to have caused the impact which resulted in the baby's catastrophic skull injuries. See T.921,930. Appellate counsel argued that the medical testimony confirmed Jeffries' intention to cause death, or at least serious physical injuries. The Fourth Department rejected these contentions on the merits as follows:

> The evidence, viewed in the light most favorable to the People, is sufficient to support the conviction. We reject the contention of defendant that the evidence establishes his manifest intent to kill or to cause serious physical injury and thus fails to establish the culpable mental state for depraved indifference murder, i.e., recklessness. Rather, the evidence establishes that defendant acted in a fit of rage directed at the child's mother, and the jury could have reasonably inferred that, when he threw the child, "defendant consciously disregarded the risk of serious injury or death to the child, i.e., that he acted recklessly". . . .

People v. Jeffries, 56 A.D.3d at 1166-67 (internal citations and quotations omitted). As discussed below, the Court concludes that it was not objectively unreasonable for the Fourth Department to determine that a rational jury could have found that the prosecution proved beyond a reasonable doubt that Petitioner acted recklessly.

A person acts recklessly under N.Y. Penal Law § 125.25(4) when he is "aware of and consciously disregards" a "grave risk of serious physical injury or death." N.Y. PENAL LAW §§ 15.05(3), 125.25(4). This conscious disregard must constitute a "gross deviation from the standard of conduct that a reasonable person would observe." Id., § 15.05(3). The mental states of recklessness and intentionality are mutually exclusive in New York. E.g., Payne, 3 N.Y.3d at 269 (depraved indifference murder conviction reversed because the evidence was consistent only with intentional homicide); Gonzalez, 1 N.Y.3d at 467 (same). Thus, a defendant who acts with the conscious objective of causing death cannot be convicted of depraved indifference murder, because he cannot be said to have been "indifferent"—depravedly or otherwise—to the consequences of his actions, or to have "consciously disregarded" the risk of harm his actions posed. Suarez, 6 N.Y.3d at 211-12.

Here, the trial evidence showed that the time Jeffries threw Lamarah to the floor, he was in a heated argument with the child's mother and grandmother because he wanted to take Lamarah to his visit his mother. Just before he threw Lamarah, he warned that if Jiminez and Gonzalez did not let him take the baby, he was going to throw her. The evidence reasonably established, as the Fourth Department found, that Jeffries was acting in a fit of inchoate anger directed at Jiminez. It was not unreasonable for the Fourth Department to accept the jury's drawing of the inference that when he threw the child, he was not intending to kill her or seriously

injure her, but rather was devoid of any concern for her welfare-in other words, that he acted with extreme recklessness. In other words, the jury rationally could have concluded that Petitioner committed the acts in question not because he intended to do harm to Lamarah, but because he simply did not care whether grievous harm resulted to her or not. See People v. Suarez, 6 N.Y.3d at 214 ("We therefore make clear that depraved indifference is best understood as an utter disregard for the value of human life-a willingness to act not because one intends harm, but because one simply does''t care whether grievous harm results or not.").

The Supreme Court recently clarified that "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Harrington v.Richter, ___ U.S. ___, 131 S. Ct. 770, 786 (2011). AEDPA allows relief only if "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, ___ U.S. at ___, 131 S. Ct. at 786-87.  Under this "difficult" standard, Richter, ___ U.S. at ___, 131 S. Ct. at 786, Jeffries is unable to demonstrate the requisite "objective unreasonableness" of the state court's ruling regarding the sufficiency of the evidence. Even

assuming <u>arguendo</u> that a rational jury reasonably could have drawn different inference-one of intentional conduct-the inference of extreme recklessness certainly was not an "objectively unreasonable" one for fairminded jurists to reach in the particular circumstances of this case. <u>See</u> <u>Cavazos v. Smith</u>, 132 S. Ct. at 6-7 (holding that state appellate court did not unreasonably apply <u>Jackson v. Virginia</u> in deciding that evidence was sufficient to support jury's conclusion that child died from shaken baby syndrome where jury was presented with competing views by experts of how child died, was made aware of various experts' qualifications, and observed cross-examination of experts; the circuit "plainly erred in concluding that the jury's verdict was irrational, let alone that it was unreasonable for the California Court of Appeal to think otherwise") (citing 28 U.S.C. § 2254(d)).

### b. Analysis of the Fourth Department's Ruling Regarding the "Depraved Indifference" Element

Petitioner also argued that the evidence was legally insufficient to support a determination that he acted with the necessary <u>mens</u> <u>rea</u>-that is, one that evinced a depraved indifference to human life. The Fourth Department held that the jury "could have reasonably inferred from the evidence that the conduct of defendant reflected 'wanton cruelty, brutality or callousness directed against a particularly vulnerable victim, combined with utter indifference to the life or safety of the

helpless target of [his] inexcusable acts'." <u>People v. Jeffries</u>, <u>supra</u> (internal quotation and citation omitted).

Under New York law, "depraved indifference to human life" is a culpable mental state which can be proved by circumstantial evidence. <u>People v. Ford</u>, 43 A.D.3d at 5763 (citing <u>People v. Feingold</u>, 7 N.Y.3d at 296). "Depraved indifference requires a defendant's conduct to be so wanton, morally deficient and devoid of regard for the life or lives of others as to equate in blameworthiness with those killers who intentionally cause death[.]" <u>Id.</u> (citing <u>People v. Suarez</u>, 6 N.Y.3d at 211). The narrow category of cases where depraved indifference legitimately may established, notwithstanding the fact that only a single person is endangered, must "reflect wanton cruelty, brutality or callousness directed against a particularly vulnerable victim, combined with utter indifference to the life or safety of the helpless target of the perpetrator's inexcusable acts." <u>Suarez</u>, 6 N.Y.3d 213. The Fourth Department was not objectively unreasonable in determining that the jury rationally drew this inference from the evidence presented at trial.

As an initial matter, the Court finds it noteworthy that the New York Legislature "enacted subdivision (4) of Penal Law § 125.25 with a reduced intent element in child homicide cases to address the situation where juries refused to believe that an adult responsible for the care of a child would intend serious consequences as a result of physical force inflicted upon the

child[.]" <u>People v. Ford</u>, 43 A.D.3d 571, 573 (App. Div. 3d Dept. 2007) (citing Assembly Sponsor's Letter in Support, Bill Jacket, L 1990, ch 477, at 9-10). This "lesser <u>mens</u> <u>rea</u> requirement coupled with proof of reckless conduct appropriately makes child abusers responsible for the consequential results of the acts which they should have known could occur by virtue of the child's naturally vulnerable condition[.]" <u>Id.</u> (quoting Assembly Sponsor's Letter in Support, Bill Jacket, L 1990, ch 477, at 9-10 and citing Assembly Sponsor's Memorandum, Bill Jacket, L 1990, ch 477, at 7).

The trial proof, viewed in the light most favorable to the prosecution, established that Jeffries was willing to use his helpless infant daughter as a pawn in his game of dominance and control over Jiminez, her mother. Simply because he wanted to get his own way and was infuriated with Jiminez standing in the way of his doing so, he placed Lamarah's life in danger by holding her precariously in one hand out of reach and using his other hand to keep Jiminez and her mother at bay as the confrontation escalated. It culminated in Jeffries throwing his infant daughter at the floor simply to prevent Jiminez from "winning" the argument about whether Lamarah should be taken on a visit or not. The only rational inference to be drawn from these facts is that Jeffries, with utter indifference to the baby's life or safety, acted with an unspeakably wanton brutality and callousness. However, it suffices for due process that a jury rationally could have concluded that the callousness and indifference surrounding Jeffries' actions

proved that he acted "[u]nder circumstances evincing a depraved indifference to human life[,]" N.Y. PENAL LAW § 125.25(4). Furthermore, it is sufficient, for purposes of 28 U.S.C. § 2254(d), that the Fourth Department reasonably concluded that the jury rationally was able to draw the required inference on the facts presented. Cf. Rivera v. Cuomo, 10-224-pr, ___ F.3d ___, 2011 WL 6287960, at *1 (2d Cir. Dec. 16, 2011) (reversing grant of habeas relief to petitioner convicted under N.Y. Penal Law § 125.25(2) (depraved indifference murder involving an adult victim) after rehearing in light of Cavazos; finding that although evidence of "significantly heightened recklessness," was "slim, at best", evidence was not so completely lacking that no rational jury could have found defendant guilty of depraved indifference murder).

**B.   The Erroneous Failure to Issue an Amplified Jury Instruction**

Petitioner argues that his due process rights were violated because the trial court refused to give an amplified charge on intent specifically instructing the jury that if it had a "reasonable doubt as to whether or not the defendant intended to cause serious physical jury [sic] to Lamarah Jeffries, [it] must find him not guilty of Depraved Indifference Murder." T.1050-51. The trial court refused to deliver the requested charge, reasoning that an accused could engage in intentional conduct but be reckless with regard to the result.

The Fourth Department held on direct appeal that the trial court's charge "tracked the language contained in the Pattern Criminal Jury Instructions" and "properly conveyed the applicable legal principles to the jury[.]" People v. Jeffries, 56 A.D.3d at 1167 (citations omitted). The state courts here did not misapply state law; nor did they apply clearly established federal law in an objectively unreasonable manner.

The Supreme Court's habeas precedent places an "'especially heavy'" burden on a petitioner who seeks to show constitutional error from a jury instruction. Waddington v. Sarausad, 555 U.S. 179, 189 (2009) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)). "Even if there is some 'ambiguity, inconsistency, or deficiency' in the instruction, such an error does not necessarily constitute a due process violation." Id. (quoting Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam)). Instead, the petitioner "must show both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." Sarausad, 555 U.S. at 190-91 (internal quotation marks, quotation, and citation omitted).

Under New York law, "[t]he decision whether or not to give an expanded instruction is left in the sound discretion of the trial judge." Aparicio v. Artuz, 269 F.3d 78, 99 (2d Cir. 2001) (internal quotation marks and citation omitted). It bears noting that "an

-19-

omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law[.]" Henderson v. Kibbe, 431 U.S. at 155.

Here, the Fourth Department reasonably concluded that the charge as given was not erroneous. The instruction tracked the language of the applicable pattern jury instruction. Moreover, defense counsel's argument was based on dictum in an Appellate Division case, People v. Robinson, 145 A.D.2d 184 (App. Div. 4th Dept. 1989), aff'd, 75 N.Y.2d 879 (N.Y. 1990), which was later explicitly disavowed by the New York Court of Appeals. Suarez v. Byrne, 10 N.Y.3d 523, 540 (N.Y. 2008) (citing People v. Trappier, 87 N.Y.2d 55, 57 (N.Y. 1995) (considering the issue of whether a defendant can intend to cause serious physical injury to another person and at the same time recklessly create a grave risk that death will result from that conduct; concluding that the two mental states are not mutually exclusive when applied to different outcomes)). Because the Fourth Department was not objectively unreasonable in concluding, under these circumstances, that the charge given was not erroneous, this Court's inquiry under 28 U.S.C. § 2254(d)(1) is at an end.

## V.  Conclusion

For the reasons stated above, Ernest Jeffries' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Jeffries has failed to make a substantial showing of a denial of a constitutional right, the

Court declines to issue a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. <u>Coppedge v. United States</u>, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

S/Michael A. Telesca

_____
                    MICHAEL A. TELESCA
                 United States District Judge

DATED:      January 13, 2012
            Rochester, New York

-21-